**Percy Briggs WADMAN, Appellant,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 18645.**

United States Court of Appeals
Ninth Circuit.

March 26, 1964.

Bonaparte & Binder, Ronald H. Bonaparte and David A. Binder, Hollywood, Cal., for petitioner.

Francis C. Whelan, U. S. Atty., Donald A. Fareed, Asst. U. S. Atty., Chief Civil Section, and James R. Dooley, Asst. U. S. Atty., Los Angeles, Cal., for respondent.

Before JERTBERG, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge:

Petitioner, pursuant to § 106 of the Immigration and Nationality Act, 8 U.S. C. § 1105a, seeks review of (1) a final order of deportation; (2) the determination of a special inquiry officer, affirmed by the Board of Immigration Appeals, that petitioner was ineligible for discretionary relief provided by § 244 of the Act as hereinafter discussed.

Petitioner was ordered deported under § 241(a) (1) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1251 (a) (1), as one who, under § 212(a) (9) of the Act, 8 U.S.C. § 1182(a) (9), was excludable at the time of his entry in that he had theretofore been convicted of a crime involving moral turpitude.

Proof of such conviction appeared from exemplified certificates of the clerk and a deputy clerk of the Central Criminal Court, Old Bailey, London, England, reciting that petitioner "was in due form of law convicted on indictment for that he did receive 1120 universal joints and other articles the property of the Ford Motor Company Limited knowing the same to have been stolen * * *," contrary to the provisions of § 33(1) of the Larceny Act of Great Britain.

That Act provides:

"Every person who receives any property knowing the same to have

been stolen or obtained in any way whatsoever under circumstances which amount to felony or misdemeanour, shall be guilty of an offence of the like degree (whether felony or misdemeanor) * * *."

Petitioner asserts that every violation of this section would not necessarily involve moral turpitude (which the Service concedes is theoretically true), and therefore that a conviction under this section cannot be regarded as involving moral turpitude for purposes of determining deportability.

The special inquiry officer ruled (and was affirmed by the Board of Immigration Appeals) that this section was a divisible law under the rules of construction set out in Matter of C-, (1953) 5 I. & N. Decisions 65, 71.

We agree. In our view § 33(1) of the Larceny Act provides a separation between the act of receiving property "knowing the same to have been stolen," and the act of receiving property knowing it to have been "obtained in any way whatsoever under circumstances which amount to felony or misdemeanour."

■■ Under these circumstances, at least,[1] the immigration officers and courts, while precluded from considering the evidence, may examine the "record of conviction" (including the indictment or information, plea, verdict or judgment and sentence) to determine the crime of which the alien actually was convicted. If this crime be one which necessarily or inherently does involve moral turpitude, the conviction is sufficient cause for deportation.[2]

■ Here we consider the clerk's certificate to be part of the "record of conviction" within the cited authorities. In our judgment that certificate constitutes adequate proof that petitioner's crime was that of receiving property knowing it to have been stolen.

Petitioner asserts that this crime is not one necessarily and inherently involving moral turpitude. He reasons that since, under English law, knowledge that the goods are stolen may be inferred from possession under certain circumstances, conviction in those cases may be had without proof of a criminal state of mind.

We disagree. English law does not eliminate guilty knowledge as an essential element of the crime. It simply allows it to be established by inference. Petitioner has confused the ultimate fact to be proved (knowledge) with the evidence used to prove it.

We conclude that the special inquiry officer did not err in ruling petitioner to be deportable.

After being ordered deported, petitioner applied for the discretionary relief of suspension of deportation or allowance of voluntary departure under § 244(a) and (e) of the Act as amended, 76 Stat. 1247, 8 U.S.C. § 1254(a) and (e).[3]

1. It is the Service, apparently, which has imposed upon itself (Matter of C-, supra), the requirement that the statute be "divisible" as a prerequisite. Court authorities (footnote 2, infra), make no mention of such a requirement.

2. Bisaillion v. Hogan, (9 Cir. 1958) 257 F.2d 435, 437, cert. denied (1958) 358 U.S. 872, 79 S.Ct. 112, 3 L.Ed.2d 104; Tseung Chu v. Cornell (9 Cir. 1957) 247 F.2d 929, 935–936, cert. denied (1957) 355 U.S. 892, 78 S.Ct. 265, 2 L.Ed.2d 190; United States ex rel. Giglio v. Neelly (7 Cir. 1953) 208 F.2d 337, 340; United States ex rel. Zaffarano v. Corsi (2 Cir. 1933) 63 F.2d 757.

3. "(a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—

"(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he

Petitioner showed that he entered the United States February 6, 1955, seven and one half years prior to his application for relief; that he had established residence in Southern California and had his own restaurant in Manhattan Beach, California, which employed thirty people.

The special inquiry officer ruled (and was affirmed by the Board of Immigration Appeals) that petitioner did not meet two statutory requirements for eligibility for discretionary relief.

First it was held that he had not been "physically present in the United States for a continuous period of not less than seven years immediately preceding" his application.

It appears that from a time shortly after his entry, petitioner had stayed entirely within the Southern California area with the exception of a ten-day vacation trip in 1958, five days of which were spent below the border in Mexico. It is upon the basis of this five-day absence from the United States that ineligibility was determined.

In Rosenberg v. Fleuti (1963) 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000, the Supreme Court recently inquired into the circumstances under which absence from the country should affect an alien's deportability. There the alien had made a visit to Mexico of "about a couple of hours." It was held that his return to the United States did not per se constitute an "entry" as defined by § 101 (a) (13) of the Act (for purposes of determining whether he could be deported on the ground of being excludable at entry); that the fact that the departure

was knowing and voluntary did not per se render inapplicable the provision of that section that the return of a permanent alien resident after a "departure" which was "not intended" shall not constitute "entry."

The court, 374 U.S. at page 459, 83 S.Ct. at page 1810, 10 L.Ed.2d 1000, quoted with approval from DiPasquale v. Karnuth (2 Cir. 1947) 158 F.2d 878, 879, that "it is * * * important that the continued enjoyment of [our] hospitality once granted, shall not be subject to meaningless and irrational hazards." The court, 374 U.S. at page 461, 83 S. Ct. at page 1811, 10 L.Ed.2d 1000, states:

> "In making such a casual trip the alien would seldom be aware that he was possibly walking into a trap, for the insignificance of a brief trip to Mexico or Canada bears little rational relation to the punitive consequences of subsequent excludability."

And further:

> "* * * but we do not think Congress intended to exclude aliens long resident in this country after lawful entry who have merely stepped across an international border and returned in 'about a couple hours.'"

The Service seeks to distinguish Fleuti on the ground that there the court was dealing with an entry and that here we are faced with the concept of continuous physical presence. We do not regard this distinction as at all significant.

was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; * * *

  *   *   *   *   *

"(e) The Attorney General may, in his discretion, permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (4), (5), (6), (7), (11), (12), (14), (15), (16),

(17), or (18) of section 1251(a) of this title (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection."

The problem in Fleuti, upon which the court divided, was whether a voluntary and knowing departure could nevertheless be found to be "not intended." Upon this the court, at page 462, construed the intent required as one "to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." The law, it concluded, "protects the resident alien from unsuspected risks and unintended consequences of such a wholly innocent action."

Here there can be no question of the sufficiency of physical presence. The question is whether there was a sufficient continuity. In our judgment the term "continuous" is no more subject to a hard and fast construction than is the term "intended." The question is whether the interruption, viewed in balance with its consequences, can be said to have been a significant one under the guides laid down in Fleuti.

■ The answer cannot be found as matter of law. Further scrutiny by the special inquiry officer is necessary.

The second reason for petitioner's ineligibility for discretionary relief, upon which the special inquiry officer and the Board of Immigration Appeals relied, was that he had, on two occasions after entry, "committed adultery" which, under § 101(f) (2), Title 8 U.S.C. § 1101(f) (2),[4] established his lack of good moral character.

Appellant had been married for seven years at the time of his entry in 1955. He had two children. Before leaving England he had made plans with his wife that upon his having established a home in the United States his family would follow him to this country. Pursuant to plan, in June or July of 1955, with money provided by him, his wife and children traveled to Southern California.

Shortly thereafter, his wife abandoned him, taking the children to New York with the intention of returning to England. She was persuaded by petitioner to return. In December, 1955, the incidents were repeated. In February, 1956, the wife actually did return to England and has remained there ever since, notwithstanding petitioner's continued efforts to secure her return.

More than two and a half years later the two isolated acts of sexual intercourse with which petitioner is charged occurred. This is the conduct which, it has been held as a matter of law, establishes petitioner as one not of good moral character.

■ Federal law does not define adultery. California does. California Civil Code § 93 states:

> "Adultery is the voluntary sexual intercourse of a married person with a person other than the offender's husband or wife."

Since adultery here is relevant as a test of good moral character, a definition of the offense in the abstract will hardly suffice. In giving significance to the term "adultery" California itself has refused to be bound by a strict reading of its statutory definition. As an example, such conduct is held not to constitute the *crime* of adultery unless the sexual intercourse is such as to constitute cohabitation. California Penal Code §§ 269a, 269b. Isolated acts are not enough.[5]

■ In construing § 244 we are in an area in which strict construction is pecul-

---

4. 8 U.S.C. § 1101:

"(f) For the purposes of this chapter—

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

\*       \*       \*       \*       \*

"(2) one who during such period has committed adultery;

\*       \*       \*       \*       \* "

5. San Chez v. Superior Court (1957) 153 Cal.App.2d 162, 165, 314 P.2d 137; People v. Woodson (1916) 29 Cal.App. 531, 156 P. 378; People v. King (1914) 26 Cal.App. 94, 146 P. 51.

iarly inappropriate. The apparent purpose of the grant of discretion to the Attorney General is to enable that officer to ameliorate hardship and injustice which otherwise would result from a strict and technical application of the law. A strict and technical construction of the language in which this grant of discretion is couched could frustrate its purpose. A liberal construction would not open the door to suspension of deportation in cases of doubtful merit. It would simply tend to increase the scope of the Attorney General's review and thus his power to act in amelioration of hardship.

With these principles in mind, we note that Congress has not said that fornication is sufficient to defeat good moral character. Congress has not found the fact of sexual intercourse unblessed by marriage to offend the common conscience; (at least, not to such a degree as to reflect upon the character of the offender). Rather it has found offensive that extramarital intercourse which tends to destroy an existing marriage; which evidences disregard of marital vows and responsibilities.

In our judgment isolated acts of intercourse by a married person, not amounting to cohabitation, occurring after that person's spouse has, without justification, willfully and permanently abandoned the marital relationship, do not constitute adultery as that term is used in § 101(f)(2) and may not be held as matter of law to constitute bad moral character under § 244.

It follows that neither of the two grounds assigned by the special inquiry officer is sufficient as matter of law and without further inquiry to preclude the granting of discretionary relief.

Upon the application of petitioner for such relief the Board of Immigration Appeals is reversed, and the matter remanded for further proceedings.